RECEIVED

MAR 1 9 2010

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT, LOUISIANA

# UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF LOUISIANA

### SHREVEPORT DIVISION

RED RIVER PARISH PORT COMMISSION

versus

CIVIL NO. 07-0416
JUDGE TOM STAGG

HEADWATERS RESOURCES INC., ET AL.

### MEMORANDUM RULING

This is a contract dispute between the Red River Parish Port Commission (the "Port Commission") and Headwaters Resources, Inc. ("Headwaters"). Before the court is a motion for partial summary judgment[1] filed by the Port Commission and a motion for summary judgment filed by Headwaters[2] pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Record Documents 57 and 58. Based on the

---

[1]Headwaters has implied that the Port Commission's motion for "Partial Summary Judgment" is procedurally improper and should be dismissed without prejudice. See Record Document 63 at 2. Headwaters cites two non-binding cases in support of the proposition that Federal Rule of Civil Procedure 56 may not be used to "enter judgment on a portion of a single claim." See Record Document 63 at 2. This court rejects this argument as it has found no binding authority which directs it to ignore the plain text of Rule 56, which states that the parties may seek summary judgment on "all or *part of the claim*." Fed. R. Civ. P. 56(a) and (b) (emphasis added). See Calpetco 1981 v. Marshall Exploration, Inc., 989 F.2d 1408, 1415 (5th Cir.1993).

[2]During much of the time period of interest in this case, Headwaters was known as ISG Resources, Inc. ("ISG"). ISG has changed its name to Headwaters. There was no transfer or assignment of rights to a new entity, the old entity was simply renamed. See Record Document 57 at 16; Record Document 61 at 14. In this ruling, the court consistently refers to the entity formerly known as ISG by its present name, Headwaters.

following, the Port Commission's motion for partial summary judgment is **GRANTED** in part and **DENIED** in part, and Headwaters's motion for summary judgment is **DENIED**.

## I. BACKGROUND

The focus of this case is a Lease And Operating Agreement between Headwaters and the Port Commission. See Record Document 57, Ex. A-3. In the motions presently before the court, each party argues that the other party is in breach of this agreement. A brief summary of the circumstances leading to the construction of this document and the initiation of the present lawsuit are included below.

"Headwaters manages and transports coal combustion products, including fly ash." Record Document 57 at 1. Fly ash is a by-product of the coal combustion process which is used as an additive to concrete to make it stronger, more durable and easier to work with. See id.

In 2001, Headwaters was presented with data which indicated that the market in Puerto Rico would require 250,000 to 400,000 tons of fly ash per year. See id. Headwaters responded to this perceived opportunity by negotiating several agreements. See id. at 2. Headwaters contracted with CLECO to secure a supply of fly ash from the Dolet Hills Power Facility[3], and executed the agreement of present

---

[3]The court takes judicial notice that CLECO is a public utilities company based in central Louisiana. The court also takes judicial notice that the lignite mining activity associated with the Dolet Hills Power Station occurs, in part, in Red River Parish.

concern, the Lease And Operating Agreement, with the Port Commission to facilitate the shipment of fly ash on the Red River. Headwaters also secured a buyer in Puerto Rico, entering into a twenty-year fly ash supply agreement with the Puerto Rican company Ecologica Carmelo. See id.

Unfortunately, the fly ash business venture has failed to meet the expectations of Headwaters and the Port Commission. The demand for fly ash in the Puerto Rican market fell far short of the projections upon which Headwaters had relied. See Record Document 57, Statement of Undisputed Facts at 4. Instead of shipping/selling 250,000 to 400,000 tons of fly ash *per year* as originally projected, Headwaters has only shipped/sold, in total, 25,449.62 short tons of fly ash through the Red River Parish Port since August of 2003. See Record Document 58, Statement of Material Facts at 1-3.

The Port Commission and Headwaters presently disagree whether or not certain actions taken by each party constitute breaches of the Lease And Operating Agreement. The parties seem chiefly concerned with the contractual provisions outlining requirements which, if met, entitle Headwaters to several million dollars in reimbursement funds from the Port Commission for costs incurred by Headwaters during the construction of a barge loading facility at the Red River Parish Port. In its motion for summary judgment, Headwaters contends that it has satisfied the

3

requirements necessary to secure the multimillion dollar reimbursement from the Port Commission, that the Port Commission has breached the Lease And Operating Agreement by failing to tender this reimbursement and that the Port Commission's claims of breach are invalid.  In its motion for partial summary judgment, the Port Commission seeks both to identify a number of breaches on the part of Headwaters and defeat Headwaters's claim for reimbursement for the barge loading facility, asserting that the text of paragraph three and Exhibit A-2 of the Lease And Operating Agreement describe the construction of a barge loading facility with six barge loading stations, while Headwaters has constructed a barge loading facility with only four barge loading stations.

## II.  LAW AND ANALYSIS

### A.  The Governing Legal Standards.

#### 1.  Summary Judgment Standards.

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). The moving party bears the initial burden of identifying portions of the record which highlight the absence of genuine issues of material fact.  See Washburn v.  Harvey,

4

504 F.3d 505, 508 (5th Cir. 2007). The nonmovant then must point to or produce specific facts demonstrating that there is a genuine issue of material fact. See id. All facts and inferences are construed in the light most favorable to the nonmovant. See Puckett v. Rufenacht, Bromagen & Hertz, Inc., 903 F.2d 1014, 1016 (5th Cir. 1990). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under the law applicable to the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. See id. "If factual issues or conflicting inferences exist, the court is not to resolve them; rather, summary judgment must be denied." Puckett, 903 F.2d at 1016.

### 2. Louisiana Contract Law.

The parties agree that Louisiana law governs the substantive legal questions in this case. In Louisiana, the interpretation of a contract is the determination of the common intent of the parties. See La. Civ. Code art. 2045. When the words of a contract are clear, explicit, and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. See La. Civ. Code art. 2046. A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties. See La. Civ. Code art. 2053. Words used in a contract must be given their generally prevailing

5

meaning. See La. Civ. Code art. 2047. Each provision of a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. See La. Civ. Code art. 2050.

"Whether an ambiguity exists in contractual language is a question of law for the court." Avatar Exploration, Inc. v. Chevron, U.S.A., Inc., 933 F.2d 314, 320 (5th Cir. 1991) (applying Louisiana law) (citation omitted). "A contract is ambiguous only if its terms are unclear or susceptible to more than one [reasonable] interpretation, or the intent of the parties cannot be ascertained from the language employed." Gebreyesus v. F.C. Schaffer & Assoc., Inc., 204 F.3d 639, 643 (5th Cir. 2000) (applying Louisiana law); see also TIG Ins. Co. v. Eagle Inc., No. 07-30740, 2008 WL 4422333, at *3 (5th Cir. Oct. 1, 2008) (applying Louisiana law and employing the 'reasonable' language included above). "Importantly, Louisiana law 'does not allow the parties to create an ambiguity where none exists and does not authorize courts to create new contractual obligations where the language of the written document clearly expresses the intent of the parties.'" Shocklee v. Mass. Mut. Life Ins. Co., 369 F.3d 437, 440 (5th Cir. 2004) (quoting Omnitech Int'l, Inc. v. Clorox Co., 11 F.3d 1316, 1326 (5th Cir.1994)).

**B. Discussion.**

**1. The Port Commission's Motion For Partial Summary Judgment.**

In its motion for partial summary judgment, the Port Commission asserts that the following facts prove that Headwaters is in breach of the Lease And Operating Agreement: (a) Headwaters failed to ship an average of 30,000 tons of fly ash per year over a multiple two year period; (b) Headwaters shipped fly ash through the Natchitoches Parish Port after execution of the Lease And Operating Agreement; (c) Headwaters built a fly ash barge loading facility with only four stations instead of six; and (d) Headwaters allegedly failed to make timely rental payments after notice. The court will consider each of these alleged breaches in turn.

**a. The First Alleged Breach.**

The Port Commission argues that Headwaters breached paragraph twenty of the Lease And Operating Agreement, which states:

> Lessor shall have the right and option to cancel this lease, if Lessee does
> not average shipping 30,000 tons per year over any two (2) year period.

Record Document 57, Ex. A-3 at ¶ 20. The term of the Lease And Operating Agreement was set for twenty years beginning on August 13, 2003. See id, Ex.A-3 at ¶ 1.

To bear its burden to demonstrate an absence of a genuine issue of material fact on this issue, the Port Commission cites a response by Headwaters to an interrogatory which establishes that during the term of the Lease And Operating Agreement,

Headwaters handled only two shipments of fly ash through the Red River Parish Port. Headwaters shipped 11,434.97 short tons of fly ash on May 15, 2006, and 14,014.65 short tons of fly ash on February 10, 2007, through the Red River Parish Port. See Record Document 58, Ex. B at 9. Thus, only 25,449.62 short tons of fly ash have been shipped by Headwaters out of the Red River Parish Port since the execution of the Lease And Operating Agreement in 2003. The Port Commission also cites the transcript of a deposition in which a representative of Headwaters states that, to his knowledge, Headwaters does not have any current plans to make any additional shipments out of the Red River Parish Port. See Record Document 58, Ex. D at 142. The Port Commission then argues that these facts establish that Headwaters has not shipped an average of 30,000 tons of fly ash per year over any two year period, and thus Headwaters clearly breached paragraph twenty of the Lease And Operating Agreement.

In response, Headwaters does not contest the Port Commission's assessment of the total tonnage of fly ash shipped through the Red River Parish Port. See Record Document 63 at 21. Instead, Headwaters asserts that the provision quoted above fails to impose any obligation upon it; thus Headwaters argues it cannot be found in breach of this provision. Headwaters explains that the language quoted above simply recognizes "the existence of a resolutory condition that may, if the Port Commission chooses, terminate the other obligations of the Agreement." Id. Headwaters then states that the Port Commission has not yet opted to exercise its option to terminate

8

the lease agreement under this provision. See id.

The Port Commission submits that Headwaters's rebuttal is undermined by the following provision of the Lease And Operating Agreement:

> Each condition, provision or obligation hereof is essential to this lease; any default by [Headwaters] in the performance of the letter or intent of each condition, provision, or obligation of [Headwaters] stipulated herein shall be grounds for [Headwaters] being considered in default hereof and for there to be termination of this lease.

Record Document 57, Ex. A-3, at ¶ 13. The Port Commission explains that while Headwaters may debate whether the 30,000 ton language in paragraph twenty imposes an obligation, Headwaters cannot ignore the fact that this language at least constitutes a "provision" of the Lease And Operating Agreement as referenced in paragraph thirteen of the agreement. See Record Document 61 at 22-23. When Headwaters's failure to ship 30,000 tons per year over any two year period is considered in light of paragraph thirteen, the Port Commission asserts that it is clear that Headwaters is in breach of the Lease And Operating Agreement. See id.

As a matter of law, the court does not discern any ambiguity on the face of the 30,000 ton language in paragraph twenty. This provision does not establish an obligation for Headwaters. Thus, Headwaters's uncontested failure to ship 30,000 tons of fly ash over any two year period did not constitute a breach of paragraph twenty, and did not constitute a "default by [Headwaters] in the performance of the letter or intent of" paragraph twenty, as referenced in paragraph thirteen of the

9

agreement. Record Document 57, Ex. A-3, at ¶ 13. A plain reading of paragraph twenty indicates that Headwaters's actions simply afford the Port Commission the option to terminate the lease. Accordingly, the Port Commission's motion for partial summary judgment fails in this regard.

### b. The Second Alleged Breach.

The Port Commission claims that Headwaters has breached paragraph nineteen of the Lease And Operating Agreement. That provision states:

> It is understood that [Headwaters] shall be engaged in the operation of the business of shipping fly ash. [Headwaters] binds and obligates itself *during the term of this lease* to ship any and all fly ash obtained from the Dolet Hills Power Plant through the Red River Parish Port, for any of the fly ash removed from the Dolet Hills Power Plant that is to be shipped by water.

Record Document 57, Ex. A-3, at ¶ 19 (emphasis added). According to the Lease And Operating Agreement, "[t]he primary *term for the lease* is for twenty (20) years beginning on the date first entered above." Id., Ex. A-3 at ¶ 1 (emphasis added). The date "first entered above" is August 13, 2003. See id., Ex. A-3 at 1.[4]

To bear its burden to demonstrate the absence of a genuine issue of material fact on this issue, the Port Commission cites a response by Headwaters to an interrogatory which establishes that during the term of the Lease And Operating Agreement, Headwaters has handled two water shipments of fly ash through the

---

[4] In further support of their argument on this point, the Port Commission also cites, once again, paragraph thirteen of the Lease And Operating Agreement, referenced supra.

Natchitoches Parish Port. According to the cited source, Headwaters shipped 15,927.05 short tons of fly ash through the Natchitoches Parish Port on August 25, 2003, and 16,675.60 short tons of fly ash through the Natchitoches Parish Port on November 1, 2003. See Record Document 58 at 12 and Ex. B at 9. The Port Commission also attached a transcript of a deposition in which a Headwaters representative states that some of the fly ash that Headwaters shipped by water from the Natchitoches Parish Port was obtained from the Dolet Hills Power Plant. See id., Ex. E at 57-62.

Headwaters does not dispute the evidence cited by the Port Commission regarding the Natchitoches Parish Port fly ash shipments. Thus, without more, it would appear that Headwaters breached the plain terms of paragraph nineteen of the Lease And Operating Agreement. However, Headwaters submits that, as a matter of law, its Natchitoches Parish Port fly ash shipments did not breach the Lease And Operating Agreement for five reasons. As will be explained below, the defenses asserted by Headwaters fail to justify the facts noted by the Port Commission.

### i. Headwaters's First Defense.

The court will first address Headwaters's arguments regarding an alleged suspended condition. Headwaters claims that the Lease And Operating Agreement actually contains two separate contracts or groups of obligations, a construction contract and a lease contract. According to Headwaters, the obligation to ship fly ash exclusively out of the Red River Parish Port is part of the contract of lease.

11

Headwaters asserts the entire lease contract is subject to an implied, unwritten suspensive condition and that the lease contract will not come into effect until the Port Commission takes title to the barge loading facility built by Headwaters. Since the Port Commission has refused to pay for and accept title to the barge loading facility built by Headwaters, Headwaters asserts the lease contract, including the agreement to ship fly ash exclusively out of the Red River Parish Port, has yet to become effective.

The plain language of the contract is unambiguous regarding this issue and thus governs this dispute, foreclosing the argument set forth by Headwaters based on the alleged implicit, unwritten designs of the parties.  As Headwaters itself admits, paragraph one of the Lease And Operating Agreement clearly states that the term of the "lease" is for twenty years, beginning on August 13, 2003. Record Document 57, Ex.  A-3 at ¶ 1.  In paragraph nineteen of the Lease And Operating Agreement, Headwaters "binds and obligates itself *during the term of the lease* to ship any and all fly ash obtained from the Dolet Hills Power Plant through the Red River Parish Port, for any of the fly ash removed from the Dolet Hills Power Plant that is to be shipped by water." Id., Ex. A-3 at ¶19 (emphasis added). Accordingly, Headwaters's duty to ship fly ash from the Red River Parish Port was immediately binding on August 13, 2003, prior to the two Natchitoches Parish Port fly ash shipments discussed herein. If the parties had wanted to suspend the activation of this provision, they could have communicated this intent using the plain language of the contract as

12

they did in other sections of the Lease And Operating Agreement. See id., Ex. A-3 at ¶ 2 ("Annual base rent shall be payable in advance on the anniversary date of facility completion *commencing on* the transfer date of the Bill of Sale between Lessor and Lessee.") (emphasis added).

### ii. Headwaters's Second Defense.

The court will next address Headwaters's arguments regarding reciprocal obligations. Under Louisiana law, Headwaters argues that since a contract of lease is a contract with reciprocal obligations, and since the Port Commission is allegedly in breach of the lease contract at issue, Headwaters cannot be put in default by the Port Commission. The court finds that the Port Commission is not guilty of the breach alleged under this point of argument, and thus Headwaters's argument must fail.

If the contract of lease was not suspended, Headwaters asserts that when the Lease And Operating Agreement was executed, in August of 2003, the Port Commission was immediately in breach of its obligation under Louisiana Civil Code article 2684 "to deliver the thing [leased] at the agreed time and in good condition suitable for the purpose for which it was leased." The thing leased was a certain segment of land within the area known as the Red River Parish Port.[5] See Record

---

[5]Headwaters asserts that all portions of the Lease And Operating Agreement that can be construed to fall under the lease portion of that document are subject to a suspensive condition. According to Headwaters, the lease portion of the Lease And Operating Agreement was designed to come into effect only when the barge loading facility referenced in that agreement was built and when title to that facility was passed to the Port Commission. See Record Document 63 at 11-25. Although Headwaters acknowledges that the Lease And Operating Agreement provides

that the primary term of the lease is for twenty years beginning on August 13, 2003, Headwaters asserts that "a somewhat different commencement date for the contract of lease is gleaned" from a reading of the entire agreement, focusing on a few choice words and phrases. See id. at 16.

In support of this larger argument, Headwaters has attempted to define the thing leased in a manner which differs from the court's interpretation. Headwaters cites the discussion of the thing leased in paragraph one of the Lease And Operating Agreement, and focuses on the phrase highlighted below:

> Lessor does hereby lease . . . the area within the Port Area property, located in Section Six (6), Township Eleven (11), North Range Nine (9) West, Red River Parish, Louisiana, *as more fully described as those facilities and equipment in the Exclusive Use Area shown as Exhibit "A"*.

Record Document 57, Ex. A-3 at ¶1 (emphasis added).

Exhibit "A" of the agreement is a diagram showing a portion of the Red River Parish Port property, with a barge loading facility included therein. The "Exclusive Use Area" is defined in the Lease And Operating Agreement as "the actual acreage leased to [Lessee] *and all improvements made there upon* for the purpose of the transfer of its products compatible with the construction improvements and materials between land and water conveyance." Record Document 63 at 12 (quoting Record Document 57, Ex. A-3 at ¶ 4) (emphasis added). Based off of these provisions, Headwaters concludes that "the plain language of the Agreement indicates that the 'thing' leased was not merely 1.7 acres of undeveloped property, but also the [barge loading] Facility." Id. at 13. Headwaters argues that, accordingly, the entire lease was suspended until the barge loading facility was built, and until the Port Commission purchases and takes title to this barge loading facility.

The court cannot accept Headwaters's suggested interpretation since it is in direct conflict with explicit contractual language. When the Lease And Operating Agreement was executed, even a plain reading of the agreement communicates that the parties obviously knew that the barge loading facility referenced in the document and in its attached exhibits was not yet built. Yet, they explicitly agreed that the twenty year term for the lease began on August 13, 2003.

It was clear that the thing leased on August 13, 2003, was a certain "area within the Port Area property." Record Document 57, Ex. A-3 at ¶ 1. It was the "actual acreage" which was "leased." Id., Ex. A-3 at ¶ 4 (definition of "Exclusive Use Area").

The provisions quoted by Headwaters which reference improvements, and the inclusion of a diagram of the barge loading facility in Exhibit A are not in conflict with this interpretation. In paragraph one of the Lease And Operating Agreement, in the initial paragraph addressing the thing leased, the Port Commission states its intention to lease the area and things described in the paragraph "under the terms and conditions and subject to the provisions hereinafter stipulated and detailed." Id., Ex. A-3 at ¶ 1. The leasing of the described acreage was not subject to any relevant condition and was immediately effective. The Port Commission's agreement to lease Headwaters a barge loading facility, however, was suspended until the requirements detailed in

14

Document 57, Ex. A-3 at ¶ 1. Headwaters asserts that the "intended use of the leased property was for the operation of a fly ash facility in the course of Headwaters'[s] shipping business, and this use was not possible until the [barge loading] Facility was built." See Record Document 63 at 18. More accurately, paragraph one of the Lease And Operating Agreement states that the lease grants Headwaters the right to use a certain portion of the Red River Parish Port property "for the operation and maintenance of an inland port terminal for the transport of fly ash, for a truck service center, office facility, water and waste treatment, waste transfer facility and for such other related business purposes as [Headwaters] shall engage." Record Document 57, Ex. A-3 at ¶ 1.

When the Lease And Operating Agreement was executed and the leased thing, the land, was tendered to Headwaters, the record before the court does not indicate that there was anything inherently wrong with the land which prohibited the purposes outlined above. The laws of lease did not require the Port Commission to guarantee that all of the mechanical equipment, infrastructure, etc., necessary to ship fly ash would be present at the Red River Parish Port at the time of the execution of the Lease And Operating Agreement. The Port Commission simply had a duty to ensure that the land it was leasing to Headwaters was timely delivered to Headwaters in a state which would not thwart the stated goals of the lessee. Headwaters does not cite

---

paragraph three of the agreement were satisfied. Id., Ex. A-3 at ¶ 3.

any evidence which shows that the Port Commission has failed to satisfy this duty.[6]

### iii. Headwaters's Third Defense.

In Headwaters's third argument, it asserts that the Port Commission is estopped from asserting claims of breach in regard to paragraph nineteen of the Lease And Operating Agreement. Headwaters cites several cases in support of the proposition that under Louisiana law "a governmental entity like the Port Commission can be estopped from denying acts of its agents which modify a contract's written terms." Record Document 63 at 20. A review of these cases reveals that the defendant is relying specifically on the theory of equitable estoppel to support this argument. See Elliott v. Catahoula Parish Police Jury, 816 So. 2d 996 (La. App. 3rd Cir. 2002); Louisiana Paving Co. v. La. Dept. of Highways, 372 So. 2d 245 (La. App. 1st Cir. 1979).

Headwaters notes several facts which it deems pertinent under this theory of estoppel. Headwaters cites portions of the record in which the Port Commission,

---

[6]The plain language of the contract indicates that when the Lease And Operating Agreement was signed by the parties, the Port Commission satisfied its obligation to tender the leased land to Headwaters in a condition satisfactory for Headwaters's intended use. Paragraph eight of the Lease And Operating Agreement states that the Port Commission obligates itself to deliver the leased property to Headwaters at the institution of the lease in a "thoroughly sanitary and first class and tenantable condition." Record Document 57, Ex. A-3 at ¶ 8. Paragraph eight also states that by accepting delivery of the leased property, Headwaters warrants that it has completed a "careful and thorough visual inspection" of the leased property and "has found no circumstance or condition violative" of the Port Commission's obligation to deliver the leased property in good condition. Id. In paragraph one of the executed Lease And Operating Agreement, Headwaters formally "take[s]" the leased property from the Port Commission, invoking the aforementioned warranty of visual inspection and approval of the leased property's condition. Id., Ex. A-3 at ¶1.

through counsel and a deposed witness, admits that some members of the Port Commission knew that Headwaters intended to ship fly ash from the Dolet Hills Power Plant by water through the Natchitoches Parish Port before these shipments took place and before the parties signed the Lease And Operating Agreement. See Record Document 58 at 16; Record Document 57, Ex. F at 21-24. Headwaters then notes that the Port Commission did not express an objection to the Natchitoches Parish Port fly ash shipments until January of 2007, over three years after the last Natchitoches shipment, when the Port Commission filed suit in state court in Red River Parish, Louisiana. By January 2007, Headwaters states that it had already invested significant sums into the Port Commission fly ash venture. Finally, Headwaters argues that "the Natchitoches Port staff is the same staff that services the Port Commission; thus, when Headwaters arranged for the shipments to leave Natchitoches, it was dealing with the Port Commission's staff." Record Document 63 at 20.

"The cases holding that estoppels are not favored by [Louisiana] courts are legion . . . ." Harvey v. Richard, 7 So. 2d 674, 677 (La. 1942); see also Wilkinson v. Wilkinson, 323 So. 2d 120, 126 (La. 1975). The Louisiana Supreme Court has repeatedly held that estoppel in its various forms is a doctrine of last resort. See Palermo Land Co., Inc. v. Planning Comm'n. of Calcasieu Parish, 561 So. 2d 482, 488 (La. 1990) (citing Howard Trucking Co., Inc. v. Stassi, 485 So. 2d 915, 918 (La. 1986)).

17

Equitable estoppel has been defined as "the effect of the voluntary conduct of a party whereby he is precluded from asserting rights against another who has justifiably relied upon such conduct and changed his position so that he will suffer injury if the former is allowed to repudiate his conduct." Morris v. Friedman, 663 So. 2d 19, 25 (La. 1995) (citations and quotations omitted). "Though rarely applied, [equitable] estoppel may be appropriate if three elements are established: (1) a representation by conduct or work; (2) justifiable reliance thereon; and (3) a change of position to one's detriment because of the reliance or representation." L.T. v. Chandler, 917 So. 2d 753, 758 (La. App. 2d Cir. 2005); see also Morris, 663 So. 2d at 25. "When invoking the doctrine against a governmental agency, a somewhat greater burden may be appropriate, which would involve: (1) unequivocal advice from an unusually authoritative source, (2) reasonable reliance on that advice by an individual, (3) extreme harm resulting from that reliance, and (4) gross injustice to the individual in the absence of judicial estoppel." Showboat Star P'ship v. Slaughter, 752 So. 2d 390, 394 (La. App. 1st Cir. 2000) (rev'd on other grounds); see also Showboat Star P'ship v. Slaughter, 789 So. 2d 554, 562-63 (La. 2001); CHL Enter., L.L.C. v. La. Dep't of Revenue, 23 So. 3d 1000, 1005-06 (La. App. 3d Cir. 2009); Gulf States Utils. Co. v. La. Pub. Serv. Comm'n, 633 So. 2d 1258, 1265-68 (La. 1994) (Dennis, J., concurring).[7]

---

[7]In Louisiana, the emergence of this heightened burden for parties invoking estoppel against a governmental entity began with then Justice Dennis's concurrence in Gulf States

The party invoking the doctrine of equitable estoppel bears "the burden of proving the facts upon which the estoppel is founded, as well as the affirmative showing that he was misled by the acts and forced to act to his prejudice . . . ." Harvey, 7 So. 2d at 677. "The representation required for the application of equitable estoppel is usually characterized as a 'misrepresentation,' which generally implies intent and suggests deliberate falsification." Eicher v. La. State Police, 710 So. 2d 799, 804 (La. App. 1st Cir. 1998). "A party invoking this doctrine must exercise such diligence as would reasonably be expected under the prevailing circumstances to avoid mistake or understanding." Chandler, 917 So. 2d at 758. "A party having the means readily and conveniently to determine the true facts, but who fails to do so, cannot claim estoppel." Morris, 663 So. 2d at 25. "[E]stoppels . . . properly apply only as to representations of fact." Id. "A misrepresentation of law does not generally invoke equitable estoppel." Eicher, 710 So. 2d at 804. Nor will "mere silence . . .

---

Utilities Company, 633 So. 2d at 1266-1268. Thereafter, the Louisiana Court of Appeal, First Circuit, citing and applying the aforementioned heightened estoppel standard noted by Justice Dennis, found that estoppel was properly asserted against the Louisiana Department of Revenue. See Showboat Star P'ship, 752 So. 2d at 394-95. The Louisiana Supreme Court granted certiorari in the Showboat Star case and reversed on the grounds that the factors of the heightened estoppel standard were not satisfied by the facts of that case, implicitly indicating its approval of the application of the heightened estoppel standard. See Showboat Star P'ship, 789 So. 2d at 562-63. In 2009, the Louisiana Court of Appeal, Third Circuit, in a case involving a governmental entity, expressed the view that in Showboat Star, the Louisiana Supreme Court "established a four-pronged test to determine whether a party may avail itself of estoppel against a public agency," and proceeded to explain and apply the heightened estoppel standard this court has noted above. CHL Enter., LLC, 23 So. 3d at 1005-06. While it seems that the Louisiana Supreme Court has indeed approved the use of this heightened estoppel standard in cases involving public entities, this court, out of an abundance of caution, has considered both the traditional estoppel standards and the enhanced equitable estoppel standards.

work as estoppel." Harvey, 7 So. 2d at 677.

> To make the silence of the party operate as an estoppel the circumstances must have been such as to render it his duty to speak, and there must also be an opportunity to speak. And it is essential that he should have had knowledge of the facts, and that the adverse party should have been ignorant of the truth, and have been misled into doing that which he would not have done but for such silence. As a corollary to the proposition that the party setting up an estoppel must have acted in reliance upon the conduct or representations of the party sought to be estopped, it is as a general rule essential that the former should not only have been destitute of knowledge of the real facts as to the matter in controversy, but should have also been without convenient or ready means of acquiring such knowledge.

Id. (citations and quotations omitted).

Under these governing standards, this court finds that Headwaters cannot survive partial summary judgment as to the Natchitoches Parish Port fly ash shipments by relying on the theory of equitable estoppel. As will be explained below, Headwaters has failed to cite evidence demonstrating that it can bear its burden at trial to satisfy either the first factor of the traditional formulation of the equitable estoppel analysis or the first factor of the more restrictive formulation of the equitable estoppel analysis for cases where estoppel is asserted against a public entity like the Port Commission.[8]

As previously stated, under the traditional formulation of the equitable estoppel analysis, the first factor requires proof of a representation by the adverse party by

---

[8]The Red River Parish Port Commission is an entity created by the Louisiana Legislature. See La. R.S. 34:3166, et. seq.

conduct or work upon which the moving party relied.  The first factor of the more restrictive version of the equitable estoppel analysis requires proof of unequivocal advice from an unusually authoritative source upon which the moving party relied. Headwaters does not cite any evidence which indicates that it relied on any legally significant conduct or work by the Port Commission when it decided to ship fly ash out of the Natchitoches Parish Port.  There is certainly no evidence of a relevant, direct communication from the Port Commission to Headwaters. Furthermore, in keeping with the legal standards previously explained, the Port Commission's silence cannot be relied on to satisfy the factors of the estoppel analysis because Headwaters fails to cite any portion of the record indicating that both parties were not in parity in regards to their knowledge of the pertinent facts.

Headwaters implies that the members of the  Natchitoches Parish Port staff were acting as agents or mandatories of the Port Commission.  Thus, when the Natchitoches Parish Port staff facilitated Headwaters's Natchitoches fly ash shipments this, in fact, communicated the assent of the Port Commission to these shipments. To substantiate this claim, Headwaters relies on excerpts from a transcript of a deposition of Robert Breedlove ("Breedlove"), then executive director for the Natchitoches Parish Port. See Record Document 63, Ex.  5 at 4.  According to the transcript, Breedlove stated:

> November 2003 the Natchitoches Parish Port and the Red River Parish Port entered into a cooperative agreement whereby we would provide services to them, since they do not have a staff.  Mainly that was to

21

> assist them in a project, a construction project whereby they had received a grant through the Port Construction Development Priority Program to build infrastructure at the Port.
>
> They had never dealt with a project like that, we had; so we assisted them with that, and then as things evolved we began to take care of administrative things, like, for instance, prepare their meeting minutes, attend their meetings and things like that.

Id., Ex. 5 at 4-5. However, the court notes that later in that same deposition[9], Breedlove specifically stated that he could not testify to the capabilities of the Red River Parish Port at the time of the Natchitoches fly ash shipments, and that he did not know why Headwaters shipped fly ash through the Natchitoches Parish Port. See Record Document 57, Ex. F at 22-23. Breedlove stated "I just know that [Headwaters] came to us and wanted to ship fly ash, and we were able to accommodate them." Id., Ex. F at 22.

The cited sources do not indicate that the members of the Natchitoches Parish Port staff were mandatories in fact who were duly empowered to approve deviations from Port Commission contracts. The evidence cited by Headwaters also does not support any claim of putative mandate. See La. Civ. Code art. 3021.[10] For example,

---

[9]The court cites to two different exhibits attached to memoranda filed by Headwaters which provide excerpts from the same deposition. See Record Document 57, Ex. F at 1 (labeling this as the transcript of the deposition of Breedlove and Dayton C. Carlisle taken on March 13, 2009); Record Document 57 at 16 n.89 (confirming that pages 21-24 of Exhibit F contain testimony from Breedlove); Record Document 63, Ex. 5 at 1 (bearing a label identical to the label of the previously cited deposition); Record Document 63 at 20 n.83 (confirming pages 4-5 of Exhibit 5 contain the testimony of Breedlove).

[10] Louisiana Civil Code article 3021 states, "[o]ne who causes a third person to believe that another person is his mandatory is bound to the third person who in good faith contracts with

the cited portions of the record fail to establish that the Port Commission communicated to Headwaters that the Natchitoches Parish Port staff could authorize a deviation from a written contract on behalf of the Port Commission, or that the Natchitoches Parish Port staff made any independent communication to this effect. Moreover, the cited sources do not indicate that Headwaters was aware of or, *more importantly*, relied upon the cooperative agreement between the Natchitoches Parish Port and the Red River Parish Port when it arranged to ship fly ash out of Natchitoches.[11] Thus, Headwaters has failed to satisfy its burden to cite evidence which establishes that Headwaters relied on any legally significant conduct or work by the Port Commission when the fly ash was shipped from Natchitoches. Accordingly, the first factor of the traditional estoppel analysis is not satisfied. Furthermore, there is no evidence of unequivocal advice from an unusually authoritative source representing the Port Commission upon which Headwaters relied to justify the Natchitoches fly ash shipments. Hence, the first factor of the more restrictive estoppel analysis for public entities is also not satisfied. Therefore, this

---

the putative mandatory."

[11] The sparse evidence Headwaters has cited in support of this argument indicates that, during the relevant time frame, Headwaters simply worked with the Natchitoches Parish Port staff in their capacity as the administrators of that port without any expressed care for and without relying upon any connection the Natchitoches Parish Port staff may have had to the Port Commission. It was Headwaters's burden to cite *specific excerpts* from the record which prove otherwise, and they have failed to do so. See Malacara v. Garber, 353 F.3d 393, 405 (5th Cir. 2003) (quoting United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)) ("'Judges are not like pigs, hunting for truffles buried in briefs.'").

court finds that Headwaters cannot survive partial summary judgment as it concerns the Natchitoches Parish Port fly ash shipments by relying on the theory of equitable estoppel.

### iv. Headwaters's Fourth Defense.

Headwaters also argues that it was not provided with the notice the Lease And Operating Agreement requires before a party may be found in default. Headwaters primarily relies on paragraph thirteen of the Lease And Operating Agreement to support this argument. In pertinent part, paragraph thirteen states:

> Neither Lessor nor Lessee shall be considered in default as to any obligation or condition of this lease, and the lease shall not be considered as violated in any way unless the status claimed to be a default or violation shall continue for fifteen (15) days after written notice is posted by certified mail to Lessor or Lessee, as the case may be, amounts due, including any penalties and interest, within the thirty (30) days after notice is given. Non-monetary defaults may be cured by the good faith commencement of activity needed to cure within the thirty day period and diligently continuing such activities until cure is completed.

Record Document 57, Ex. A-3 at ¶ 13.

The Port Commission first asserts that the shipment of fly ash out of the Natchitoches Parish Port is a breach of contract which cannot be cured, and that, accordingly, "putting Headwaters in default is unnecessary." Record Document 58 at 25. This argument is flatly contradicted by the plain language of paragraph thirteen of the Lease And Operating Agreement, and therefore must fail. See id. (stating that neither party "shall be considered in default as to any obligation or condition of this

24

lease, and the lease shall not be considered as violated in any way" unless the requirements in paragraph thirteen are satisfied).

Alternatively, the Port Commission has argued that the lawsuit it filed in state court on January 3, 2007, clearly put Headwaters in default. See id. The referenced state court petition, in pertinent part, stated:

> The acts constituting the default of Headwaters Resources, Inc. include but are not limited to the following:
>
> . . . .
>
> d) Headwaters Resources, Inc. has failed to ship through the Red River Parish Port all of the fly ash removed from the Dolet Hill Power Plant that was shipped by water and in fact has shipped fly ash from the Natchitoches Parish Port;

Record Document 1, State Court Petition at ¶ 8. The record shows that this state court petition was served to Headwaters's statutory agent. See id., Ex. A. The Port Commission cites several sources which show that, under Louisiana's Civil Code, a lawsuit may serve as notice sufficient to lead to a subsequent finding of default. See 6 Saul Litvinoff, Louisiana Civil Law Treatise, The Law of Obligations, § 2.5 (West 1999) (citing La. Civ. Code art. 1991)[12]; Moran v. Wilshire Ins. Co., 520 So. 2d 1173 (La. App. 3d Cir. 1988). Headwaters does not contest the assertion that the Port Commission's lawsuit was sufficient to meet the statutory requirements for

---

[12] "The Louisiana Civil Code provides that an obligee may put the obligor in default by filing suit against him for performance of his obligation. It is quite clear, indeed, that when confronted with a judicial demand for performance an obligor can have no doubt that the obligee regards the performance as already due and delayed." 6 Saul Litvinoff, Louisiana Civil Law Treatise, The Law of Obligations, § 2.5 (West 1999) (citing La. Civ. Code art. 1991).

notice. See Record Document 63 at 22. Instead, Headwaters asserts that what is considered sufficient notice under the civil code is not relevant to the present issue; the issue is what is sufficient notice under the terms of the contract between these two parties. See id. Under the standards set forth by the contract, Headwaters argues that proper notice has not been given.

Headwaters first notes that paragraph thirteen expressly requires that notice of default must be "posted by certified mail," and that there is no evidence that the Port Commission has ever provided Headwaters notice by "certified mail" as to the Natchitoches Parish Port fly ash shipments or any other alleged breach. Id. at 22 n. 96. The record before the court shows that the Port Commission's state court petition was served on Headwaters, but does not indicate that this service occurred by certified mail. See Record Document 1, Ex. A (state court return of service for Headwaters through CT Corp. on 2/08/2007).

Headwaters cannot survive summary judgment on this hyper-technical interpretation of the term "certified mail." It is clear that the notice provided by the Port Commission's state court petition, which Headwaters does not dispute provided sufficient notice under the relevant statutes, was delivered in a manner sufficient to satisfy the notice requirements of the Lease And Operating Agreement.

> The purpose of the requirement that notice be given by certified mail is to ensure receipt. Where the party to be notified does not contest receipt, the failure to use certified mail does not invalidate the notice. Where adequate notice

is in fact given and its receipt is not contested, technicalities of form may be overlooked.

Board of Comm'rs of the Port of Orleans v. Turner Marine Bulk, Inc., 629 So. 2d 1278, 1283 (La. App. 4th Cir. 1993) (addressing language in a lease contract) (internal citations omitted), writ denied, 634 So. 2d 392 (La. 1994); see also Gilchrist Const. Co., Inc. v. Terral Riverservice, Inc., 819 So. 2d 362, 366 (La. App. 3d Cir. 2002) (addressing statutory registered or certified mail requirement and issuing findings substantially similar to those noted above), writ denied, 828 So. 2d 1119 (La. 2002). Headwaters does not deny that it received the state court petition and thus it received the required notice of default required under the Lease And Operating Agreement.

Headwaters next urges that the state court petition did not qualify as sufficient notice of default under paragraph thirteen of the Lease And Operating Agreement because it did not contemplate a cure. Headwaters implies that every proper notice under paragraph thirteen of the Lease And Operating Agreement must suggest a potential cure. In this regard, the plain language of the provision speaks for itself. The party providing notice must inform the other party of "the status claimed to be a default or violation." Record Document 57, Ex. A-3 at ¶ 13. The Port Commission is not required to suggest a cure under the express terms of paragraph thirteen. A notice is simply "an announcement or intimation of something impending; [a]

27

warning." Random House Dictionary of the English Language 1326 (2d ed. 1987).[13]
The Port Commission's state court petition was sufficient in this regard.

### v. Headwaters's Fifth Defense.

In its final series of arguments, Headwaters argues that even if one assumes
that the notice of default was adequate as to the breach effected by the Natchitoches
Parish Port fly ash shipments, Headwaters's subsequent actions have cured this
default. See Record Document 63 at 23-24. Even if this court were to assume that the
Port Commission was incorrect in its assertion that the breach related to the
Natchitoches Parish Port fly ash shipments was incurable, the court does not agree
that Headwaters's actions constitute a cure which forecloses a finding of default
under paragraph thirteen of the Lease And Operating Agreement.

Headwaters has asserted that the only damage that the Port Commission could
have suffered due to the Natchitoches Parish Port fly ash shipments was a deprivation
of wharfage fees.  See id.  Headwaters then notes that in December of 2007 it
tendered a payment of $40,000 to the Port Commission to pay the "minimum
wharfage" allegedly required under the Lease And Operating Agreement for the years
2004-2007. See id. at 23 n. 100 (explaining that the submitted  payments were to

---

[13] However, it is clear that the party providing notice must make a good faith effort to
describe the status claimed to be a default or violation.  See La. Civ. Code art. 1759 ("Good faith
shall govern the conduct of the obligor and the obligee in whatever pertains to the obligation.").
In many cases, like those involving a specific missed payment, this good faith description of the
default or violation will inevitably provide a clear description of the potential cure.

cover the costs of *minimum wharfage* and *land rental* specifically); Record Document 61 at 18. Headwaters asserts that this payment more than adequately cures any potential damage the Port Commission may have suffered due to the Natchitoches Parish Port fly ash shipments.

Paragraph thirteen of the Lease And Operating Agreement states that any cure sufficient to foreclose a finding of default must occur or commence within thirty days from the notice of default. See Record Document 57, Ex. A-3 at ¶ 13. The receipt of service of process for the Port Commission's state court petition is marked "2/08/2007." Record Document 1, Ex. A. Thus, even if the court assumes Headwaters's payments in December of 2007 could cure the breach associated with the Natchitoches Parish Port fly ash shipments, this cure did not occur within the time limit set by the Lease And Operating Agreement and thus does not foreclose a finding of default.

However, Headwaters asserts that when the Port Commission accepted the minimum wharfage payments in December of 2007 "any and all bases of default were immediately cured and the Port Commission was required to issue a new notice to put Headwaters in default." Record Document 63 at 24. The court finds that the laws concerning compromise and the doctrine of accord and satisfaction govern this question.[14] "For accord and satisfaction to occur, a debtor must tender payment to a

---

[14] Headwaters cites General Electric Capital Corp., 950 F.2d 944, 956 (5th Cir.1991) and Canal Realty & Improvement Co. Inc. v. Pailet, 46 So. 2d 303, 306 (La. 1950). These cases

creditor in full satisfaction of a Disputed claim, and the creditor in turn must accept the tender. . . As in any other contract, acceptance of the offer must be an informed consent. . . . *The offer of compromise must be explicit*." <u>Louisiana Nat.  Bank of Baton Rouge v.  Heindel</u>, 365 So. 2d 37, 38-39 (La.  1978) (emphasis added); <u>Cf. Rivett v.  State Farm Fire and Cas.  Co.</u>, 508 So. 2d 1356, 1358 n.3 (La.  1987) (noting that accord and satisfaction is a common law doctrine whose use in Louisiana's civil law jurisdiction is questionable and that Louisiana has specific codal provisions governing the requirements for contracts of compromise); <u>Cf.</u> La.  Civ. Code arts. 3071 <u>et.  seq</u>. Similarly, the Louisiana Civil Code states that a contract of compromise is only effected when the claimant of a disputed claim "accepts payment that the other party tenders with the *clearly expressed written condition* that acceptance of the payment will extinguish the obligation." La.  Civ.  Code art. 3079 (emphasis added). When Headwaters tendered the referenced payment in December of 2007, the cover letter to which the pertinent checks were attached expressly stated that the payments were for the "annual put-through" or minimum wharfage due, and

---

are inapposite. In both of these cases, the court notes that when a lease of an immovable is involved, and the rent is not timely paid, the default caused by the delinquent payment is cured, and the previous notice of default is vitiated, if the lessor later accepts payment of all or a portion of the amounts that were delinquent.  It is clear these courts were addressing situations in which both parties know that the default at issue was specifically a missed rental payment, and thus the lessor was consciously accepting a late payment to satisfy the debt caused by the missed rental payment.  This jurisprudential logic does not extend to the present situation.

The court finds that the law of compromise governs the instant question.  As discussed above, under this law, the payments of December 2007 do not vitiate the notice of default as it regarded the Natchitoches Parish Port fly ash shipments.

for the "annual lease" or rental due on the land. See Record Document 58, Ex. 44; see also Record Document 63 at 23 n.100 (wherein Headwaters confirms the above). There is no mention in the cover letter that this payment was in any way an attempt to cure the breach of the Lease And Operating Agreement caused by the Natchitoches Parish Port fly ash shipments. There is no evidence that the Port Commission made an informed decision to accept these payments as a cure for the Natchitoches Parish Port fly ash shipments. Therefore, the Port Commission's acceptance of the payments Headwaters tendered in December of 2007 does not foreclose a finding of default based on the Natchitoches Parish Port fly ash shipments.

In sum, the court finds that the Port Commission is entitled to a finding on summary judgment that Headwaters breached the Lease And Operating Agreement by shipping fly ash out of the Natchitoches Parish Port after August 13, 2003. The facts concerning this breach were uncontested, and the legal defenses asserted by Headwaters fail to overcome the opposing facts noted by the Port Commission.

### c. The Third Alleged Breach.

The Port Commission argues that Headwaters has breached paragraph three of the Lease And Operating Agreement. See Record Document 58 at 10. This paragraph, in pertinent part, states:

> As an incentive for Lessee to throughput waterborne tonnage through Lessor's facility, Lessor shall make available to Lessee up to Two Million, Three Hundred Twenty-One Thousand, Three Hundred Fifty and no/100 dollars ($2,321,350) for construction improvements, *as more*

31

*fully described in Exhibit A-2*, subject to the following covenants and other provisions contained herein: . . . .

Record Document 57, Ex. A-3 at ¶ 3 (emphasis added). Exhibit A-2 of the Lease And Operating Agreement describes a barge loading facility with six separate barge loading stations. Id. at Ex. A-2.[15]

As proof of this alleged breach, the Port Commission cites the deposition of an engineer who testified that the barge loading facility built by Headwaters has only four loading stations, not the six described in Exhibit A-2 of the Lease And Operating Agreement. See Record Document 58, Ex. F at 77-84. In response, Headwaters admits that the design for the barge loading facility originally included six barge loading towers, as per Exhibit A-2 of the Lease And Operating Agreement, and that Headwaters later changed this design and constructed a facility with four barge loading towers. See Record Document 63 at 7. Thus, without more, it appears that Headwaters has violated the express terms of the Lease And Operating Agreement. However, Headwaters asserts several defenses to justify this deviation from the plain text of the Lease And Operating Agreement.

Before reviewing the defenses asserted by Headwaters, the court must determine whether Headwaters had an actual obligation, of which it could be found in breach, to build the barge loading facility described in paragraph three. The parties

---

[15] The court has attached Exhibits A and A-2 of the Lease And Operating Agreement to this memorandum ruling as appendices.

have expressed conflicting views in this regard over the course of the litigation process.[16]

After considering paragraph three of the Lease And Operating Agreement in light of the other provisions of that contract, this court has no difficulty finding that the Lease And Operating Agreement imposes an obligation on Headwaters to build the barge loading facility specifically described in paragraph three and Exhibit A-2 of the agreement. The language used in paragraph three does not clearly indicate that

---

[16] In the beginning of the litigation process, the Port Commission forcefully expressed the view that Headwaters was contractually bound to construct the barge loading facility referenced in paragraph three of the Lease And Operating Agreement. See Record Document 58 at 10-12 (referencing "the construction improvements required" and stating "the Lease And Operating Agreement required the construction of six separate fly ash barge loading units" and "[Headwaters] was contractually obligated to build" the barge loading facility); Record Document 61 at 7-11 (stating "Headwaters was obligated under the Lease And Operating Agreement to design and construct . . . a barge loading facility with six separate fly ash barge loading units"). However, in more recent memoranda, the Port Commission has reversed its position on this point. See Record Document 65 at 5 (stating "Significantly, Headwaters is not obligated by the Lease And Operating Agreement to construct anything for the" Port Commission, and the agreement "does not even require Headwaters to build the fly ash barge loading facility"); Record Document 71 at 3 ("Headwaters has been unable to direct this Court to any language in the Lease And Operating Agreement (because there is none) requiring Headwaters to build the fly ash barge loading facility."). The court notes that this reversal seems to be predicated upon the Port Commission's perception that the "pivotal issue in this case has become the characterization of the non-lease obligation" contained in the Lease And Operating Agreement as either a construction contract or a contract of sale. See Record Document 71 at 1-3 (arguing that while a construction contract has at its core an obligation to do, the Lease And Operating Agreement imposes no obligation on Headwaters to build the barge loading facility).

By comparison, Headwaters has remained fairly constant in its arguments on this point, although the language Headwaters has used regarding this topic has become stronger with the passage of time. See Record Document 57 at 6 ("Headwaters agreed to pay for the design and completion of the Facility based upon Port Commission's promise to repay those construction costs."); Record Document 64 at 1 (stating the Lease And Operating Agreement "required Headwaters to build the Facility"); Record Document 68 at 2 (stating that the contract at issue calls for "the construction and operation of a cargo facility").

the parties believed that the construction of said barge loading facility was optional rather than mandatory.[17]  When the terms in paragraph three are considered in the context of the entire agreement, the only logical and reasonable conclusion that can be reached is that Headwaters was obligated to build the barge loading facility described therein.  For example, as the court will explain in a subsequent section of this ruling, Headwaters's obligation to pay the Port Commission all of the various rentals and fees noted in the Lease And Operating Agreement is suspended until several  requirements are satisfied, primarily the construction of the barge loading facility specifically described in paragraph three and Exhibit A-2 of the agreement. Therefore, if this court interpreted paragraph three of the agreement as a provision which simply provided Headwaters with the option to either build the facility specifically described in the agreement for reimbursement or build a facility which did not satisfy the requirements therein without the benefit of reimbursement, Headwaters could construct a facility which did not comport with the Lease And

---

[17]The parties have each briefly commented on the fact that the Lease And Operating Agreement does not establish a deadline by which the barge loading facility was to be completed. See Record Documents 57 at 16-17 and 61 at 13-14. As the Port Commission noted in its memorandum, if an express time for performance is not specified in a contract, the obligation must be performed within a reasonable time. See Record Document 61 at 13; La. Civ. Code art. 1778 (the codification of this principle); Bonvillain Builders, LLC v. Gentile, No. 2008 CA 1994, 2009 WL 3530867, *6 (La. App. 1st Cir. Oct. 30, 2009) (This civil code principle applies here as "[i]t is an established principle that laws that exist at the time of execution of a contract form a part of that contract and are incorporated in it.  These laws form part of the contract as though expressly written therein."). The facility specifically described in paragraph three and Exhibit A-2 of the Lease And Operating Agreement has not been built to date.  The court agrees with the Port Commission that this is unreasonable. See Record Document 61 at 14.

Operating Agreement and ship fly ash out of the Red River Parish Port for several years without activating its obligation to pay any rent or wharfage to the Port Commission – an illogical and unreasonable result.  It is clear from a plain reading of the Lease And Operating Agreement that the agreement was designed based on the understanding that Headwaters would build the barge loading facility specifically described in paragraph three and Exhibit A-2 of the Lease And Operating Agreement.

Having found that the Lease And Operating Agreement imposes an obligation upon Headwaters to build the barge loading facility specifically described in paragraph three and Exhibit A-2 of that agreement, the court must now determine if Headwaters is in breach of this obligation.  As noted above, the parties do not dispute that the Lease And Operating Agreement, as originally drafted, requires Headwaters to construct a barge loading facility with six barge loading stations, and that Headwaters deviated from this plan and instead built a facility with only four barge loading stations.  To survive summary judgment, Headwaters relies upon four legal arguments to justify its actions.  Each of these defenses will be explored in turn.

### i. Headwaters's First Defense.

Headwaters first contends that the Port Commission approved the reduction of the number of barge loading stations from six to four through two agents, and that this method of approval is in accord with the plain terms of the Lease And Operating

Agreement.[18]  See Record Document 63 at 9.  Headwaters introduces this argument by noting that paragraph three of the Lease And Operating Agreement states that Headwaters should build the barge loading facility, as described in Exhibit A-2, "subject to the following covenants and other provisions contained herein." Record Document 57, Ex. A-3 at ¶ 3. The covenants and provisions referenced in this quote include the following statement: "[a]ll engineering designs and plans shall be submitted to the Lessor for *prior approval* and Lessor retains the right to reasonably inspect construction progress." Id.   (emphasis added). Referencing this line, Headwaters argues that the Lease And Operating Agreement "did not specify any particular manner in which the [prior] 'approval' of design changes must occur." Record Document 63 at 9.  Headwaters then contends that the evidence shows that the Port Commission retained Wink Engineering, LLC ("Wink") to act as its agent in the design and construction process. See id.  Headwaters then argues that Wink

---

[18]The Port Commission notes that the barge loading facility described in the Lease And Operating Agreement, i.e., a barge loading facility with six barge loading stations, would cost approximately $4,500,000. See Record Document 61 at 9-10. Under the Lease And Operating Agreement, the Port Commission would have purchased this facility from Headwaters for $2,821,350. See Record Document 57, Ex. A-3 at ¶ 3. The total cost of the barge loading facility actually built by Headwaters, with four barge loading stations, was $3,587,342. See Record Document 61 at 9-10.

   The Port Commission argues that these facts alone discredit Headwaters's argument that the Port Commission approved, through various means, the reduction of the number of barge loading stations from six to four. Since the Port Commission's purchase price in the Lease And Operating Agreement was never amended, the Port Commission argues that to accept Headwaters's argument in this regard the court must accept the premise that the Port Commission chose to sacrifice nearly one-million dollars in value for no apparent consideration. See id. Although the court has not rested its decision on these grounds, the court has noted this argument with interest.

and the Port Commission's attorney, in accordance with the language of the Lease And Operating Agreement quoted above, approved the design change which reduced the number of barge loading stations from six to four. See id.

Headwaters is incorrect in its assertion that the Lease And Operating Agreement does not specify the method in which the above-referenced "prior approval" of design changes must occur. In paragraph twenty-six of the agreement, it states:

> The parties hereto hereby accept this lease and operating agreement in all its parts and clauses, and agree that this writing covers the entire agreement existing between the parties hereto and that no contemporaneous or subsequent agreement entered into with reference to this lease and operating agreement , by the parties hereto, shall be binding upon any party hereto *unless reduced to writing and signed by the Lessor and Lessee.*

Record Document 57, Ex. A-3 at ¶ 26 (emphasis added). The above-quoted provision clearly states that any agreement between Headwaters and the Port Commission subsequent to and regarding the Lease And Operating Agreement must be in writing and signed by both parties. See id. Headwaters has not provided any evidence that there is a signed written amendment to the Lease And Operating Agreement in which the parties jointly approved the design change at issue.

Furthermore, the portions of the record cited by Headwaters fail to support these "agent" arguments. Again, Headwaters asserts that the Port Commission's attorney, Bill Jones, and representatives of Wink acted as agents of the Port

Commission and "approved" the design change which reduced the number of barge loading stations from six to four. Even assuming arguendo that these parties were agents of the Port Commission properly empowered to grant the approval referenced, the evidence cited by Headwaters fails to demonstrate that these parties "approved" the design change at issue.

As evidence of the alleged design change approval given by the Port Commission's attorney, Headwaters cites a deposition in which a letter from the Port Commission's attorney to a Headwaters representative is discussed. The discussed portion of the letter in no way signifies approval of the design change at issue. In the letter, the Port Commission attorney simply asked a Headwaters representative for evidence that the design change reducing the number of barge loading stations from six to four would not affect Headwaters's contractual obligation to install a facility capable of a throughput of 400,000 tons of fly ash per year. See Record Document 63, Ex. 2 at 55-56.

Similarly, the deposition of the Wink representative cited by Headwaters does not reveal that a Wink representative ever represented that they were approving a change to the Lease And Operating Agreement which would authorize a reduction of the number of barge loading stations from six to four. See Record Document 63, Ex. 1. In fact, based on the evidence cited by Headwaters, it appears that Wink did not authorize or approve any actions on behalf of the Port Commission. Instead, Wink played a very limited role. The deposed Wink representative stated, "[e]ssentially our

role was to report [on] the progress [of the barge loading facility construction project], just to communicate with the Port themselves." Id., Ex. 1 at 26, lines 1-3. In the cited deposition, the Wink representative stated that "we never had anything to do with the contract [between Headwaters and the Port Commission]." Id., Ex. 1 at 15, lines 2-3. In fact, the deposed Wink representative stated that the consultant for the Port Commission who outlined the parameters for Wink's role in evaluating the construction of the barge loading facility did not even provide Wink with a copy of the Lease And Operating Agreement. See id., Ex. 1 at 16, lines 3-4.

Though Headwaters implies otherwise, the reports Wink generated clearly had nothing to do with the explicit terms of the Lease And Operating Agreement. Instead of evaluating the construction of the barge loading facility based on the contract between Headwaters and the Port Commission, Wink, acting on the direction provided by a consultant hired by the Port Commission, focused on ensuring that the barge loading facility could handle 400,000 tons of cargo annually. See id., Ex. 1 at 14-15. The deposed Wink representative stated that he knew that the Port Commission had been informed that Headwaters had altered its design for the barge loading facility to include four instead of six loading stations, and since he *perceived* no objection from the Port Commission as to this change, he proceeded to prepare construction evaluation reports based upon the drawings of the redesigned, four-station barge loading facility which were provided by Headwaters. See id., Ex. 1 at 90. Again, based on the advice of a consultant hired by the Port Commission, the

Wink engineers focused on ensuring that the facility which Headwaters designed and built could handle 400,000 tons of cargo annually. See id., Ex. 1 at 15 and 90. The Wink reports never measured compliance with the plain terms of the contract between Headwaters and the Port Commission.

At no point in the transcript cited by Headwaters does the deposed Wink representative state that he or any Wink employee ever received a request from Headwaters for "prior approval" for the reduction of the number of barge loading stations originally specified in the Lease And Operating Agreement. The portions of the record cited by Headwaters do not show that Wink ever gave Headwaters "approval" to deviate from the plain language of the Lease And Operating Agreement requiring a barge loading facility with six barge loading stations. It is clear that Wink reported on, responded to, but did not authorize Headwaters's actions.

### ii. Headwaters's Second Defense.

Headwaters's second set of defenses is based on the assertion that the "threshold" or "incipient" obligation of the Lease And Operating Agreement is the obligation to build or construct the barge loading facility referenced above, and thus the special rules governing construction contracts apply to the issue at hand. See Record Documents 63 at 9, 64 at 1-5 and 68 at 2. Under the special rules governing construction contracts, Headwaters asserts that even when a written contract contains a provision that change orders must be in writing, as the Lease And Operating Agreement at issue does, Louisiana law allows for a construction contract to be

modified by oral contracts and the conduct of the parties.[19]  See Record Documents

63 at 9 and 64 at 4.  Headwaters then asserts that such an extrinsic modification was

effected here by the actions of the Port Commission's agents, apparently referencing

the actions of Wink and the Port Commission attorney discussed above.  See Record

Document 63 at 9.  Headwaters also asserts that under the law governing construction

contracts, it is due payment for substantial performance even if this court finds it did

not build a barge loading facility which fully complied with the terms of the Lease

And Operating Agreement.[20]  See Record Documents 63 at 10-11 and 64 at 5.[21]  For

---

[19]In contrast to the rule applicable to construction contracts, under the generally applicable rules of contract law in Louisiana, when the words of a contract are clear, explicit, and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. See La.  Civ.  Code art. 2046.  Furthermore, as noted by Headwaters, the Fifth Circuit has held that when an agreement is not ambiguous and contains an integration clause, like the present agreement, parol evidence is not admissible to negate or vary the terms of the written contract. See Condrey v.  Suntrust Bank of Ga., 429 F.3d 556 (5th Cir. 2005); Record Document 57, Ex. A-3, at ¶ 26 (the integration clause); Record Document 57 at 9 (wherein Headwaters recognizes the previously mentioned integration clause principle).

[20]In contrast to the rule applicable to construction contracts, the law applicable to ordinary commutative contracts does not provide for recovery in the absence of full performance.  See Lane Wilson Co., Inc. v. Gregory, 322 So. 2d 369, 372 (La. App.  2d Cir. 1975) (quoting Fl. Ice Mach. Corp. v. Branton Insulation, Inc., 290 So. 2d 415 (La. App.4th Cir. 1974)); Barber Bros. Contracting Co., Inc. v. Chet Homes, Inc., 393 So. 2d 352, 357 (La. App.  1 Cir. 1980).

[21]As noted above, Headwaters seeks to classify the present contract as a construction contract primarily for two reasons.  First, it asserts that under Louisiana law written construction contracts may be modified by oral contracts and the conduct of the parties even when the written contract contains a provision that change orders must be in writing.  See Record Document 63 at 9.  It asserts that the Port Commission's actions have so modified the Lease And Operating Agreement. Second, Headwaters asserts that under Louisiana law, a building contractor is entitled to recover the contract price even though defects and omissions are present if he has substantially performed the work outlined in the building contract.  See id.  at 10.
　　The court has reviewed the case law cited by Headwaters in support of its argument regarding the unwritten amendment or modification of the Lease And Operating Agreement and

finds that this case law is inapplicable in the instant case.  The primary authority Headwaters cites to support its position as to an unwritten amendment or modification of the Lease And Operating Agreement is <u>Rhodes Steel Buildings, Inc.  v.  Walker Construction Co.</u>, 813 So. 2d 1171, 1177 (La.  App.  2d Cir.  2002).  <u>Rhodes Steel Buildings, Inc.</u>, in turn cites <u>Wisinger v. Casten</u>, 550 So. 2d 685, 687 (La. App. 2d Cir.1989), which cites, <u>Pelican Electrical Contractors v. Neumeyer</u>, 419 So. 2d 1, 5 (La.App. 4th Cir.1982), which cites <u>Pamper Corp. v. Town of Marksville</u>, 208 So. 2d 715, 717 (La.  App.  2d Cir.  1968).  The court in <u>Pamper Corporation</u> cites to the source of this doctrine, Louisiana Civil Code articles 2763 and 2764, which in pertinent part state:

> Art. 2763.  Changes or extensions of original plans, effect.
>
> When an architect or other workman has undertaken the building of a house by the job, according to a plot agreed on between him and the owner of the ground, *he can not claim an increase of the price agreed on*, on the plea of the original plot having been changed and extended, *unless he can prove that such changes\*have been made in compliance with the wishes of the owner.*
>
> \*English translation of French text incomplete; should include "or extensions."
>
> Art. 2764.  Substantial and necessary alterations.
>
> *An exception is made to the above provision*, in a case *where the alteration or increase is so great, that it can not be supposed to have been made without the knowledge of the owner*, and also where the alteration or increase was necessary and has not been foreseen.

La. Civ. Code arts.  2763 and 2764  (emphasis added). Based on the text of these articles, the court cases cited in this footnote have indeed considered evidence of unwritten modifications to construction contracts, even where the construction contract required that all contract modifications be approved in writing, but only in regards to claims for reimbursement for expenses incurred over and above that which was originally contemplated in the construction contract for work which could be considered over and above that which was required by the written contract.  These cases do not support Headwaters's claim that this court must consider arguments pertaining to alleged unwritten amendments to the contract at issue so that Headwaters might receive the contemplated contract price for less work than the written contract required, i.e., the construction of a barge loading facility with four barge loading stations instead of six.

 The court need not consider Headwaters's substantial performance argument because, as explained in this ruling, the court finds that the special rules governing construction contracts do not control in the instant dispute.  Furthermore, assuming <u>arguendo</u> that the court should view the obligation to build a barge loading facility in isolation and that this contract is a construction contract, as explained <u>infra</u> in note 26, this construction contract would be null and void since

the reasons which follow, the court finds that the rules governing construction contracts do not govern the present dispute. Accordingly, the arguments noted above must fail.

"[A] party to a contract may enter 'into a single contract and yet be bound to perform two or more different obligations.'" KSLA-TV, Inc. v. Radio Corp. of Am., 501 F. Supp. 891, 893 (W.D. La. 1980)(quoting The Work of the Louisiana Appellate Courts for the 1977-1978 Term-Sales, 39 La.L.Rev. 705, 709 (1979)). Such is the case with the Lease And Operating Agreement in the case at bar.

> When it is possible to isolate any of these obligations from the others, it remains subject to sanctions of its own. When different obligations are intimately connected, however, one of them must be recognized as fundamental and if it is one to do, for instance, the whole contract will be treated as one giving rise to obligations of that kind.

7 Saul Litvinoff, Louisiana Civil Law Treatise, Obligations Book 2, § 157 (West 1975); see also KSLA-TV, Inc. , 501 F.Supp. at 893-94 (discussing these same principles).[22] Thus, this court must determine if the various obligations imposed under the Lease And Operating Agreement can be isolated, or whether they are all intimately connected. If the court finds that the various obligations imposed under the

---

there is no evidence presented which shows that the procedures required by the Louisiana Public Bid law were followed in this case.

[22]See also Austin's of Monroe, Inc. v. Brown, 474 So. 2d 1383, 1387 (La. App. 2d 1985) (citing several cases) ("While the intent of the parties to a contract to enforce different obligations may be given effect, the contract as a whole may be characterized by its predominate or fundamental obligation.").

Lease And Operating Agreement are intimately connected, this court must determine which obligation is fundamental, and thereby determine which laws will govern the present dispute.[23]

In its latest filing, Headwaters asserts that the various obligations imposed by the Lease And Operating Agreement are designed to serve a common purpose. See Record Document 68 at 2.[24] The court agrees, and further finds that these obligations

---

[23]The distinction between classifications of obligations is material to the judicial determination of questions involving remedies, risk of loss, etc. See Swope v. Columbian Chems. Co., 281 F.3d 185, 202 (5th Cir. 2002) (applying Louisiana law).

[24] In this regard, Headwaters analogizes the present case to JTS Realty Corp. v. City of Baton Rouge, 499 So. 2d 274 (La. App. 1st Cir. 1987). In pertinent part, the court in JTS Realty Corp. considered the relationship between six separate documents which were drafted during negotiations between the City-Parish and a developer in which the city agreed to lease certain land to the developer for the construction of a hotel, office building, and additional parking facilities. See id. at 276-277. The court reached the logical conclusion that although there were six separate documents, these documents were each a part of one integrated agreement.

> Although the major contract . . . is called the Lease and Development Agreement, and the other contracts ancillary contracts, the agreements that are before us are all separate facets of a single whole, as each contract constitutes part of the cause or consideration for each other contract. That being the case, we hold the separate contracts to constitute one single contract or agreement, each by its very terms dependent on the existence of the others.

Id. at 278. Thus, the characterization of the principal document as an industrial inducement contract affected each of the remaining separate documents. See id. at 277. Based on similar reasoning, this court finds that each of the various obligations in the Lease And Operating Agreement depends on the existence of the others, and that these obligations are intimately connected. They cannot be viewed in isolation.

44

are intimately connected.[25]   The manner in which the parties constructed the present contract clearly indicates that each obligation is dependent upon the existence of the others, and that no single obligation contained in the contract was designed to stand alone, or to be isolated.[26]   Thus, the court must determine which obligation is

---

[25] See generally Austin's of Monroe, Inc., 474 So. 2d 1383. In Austin's of Monroe, Inc., a restaurant entered into an agreement to purchase a computerized system for controlling and monitoring cash drawers, sales, inventory and accounting. As part of this agreement, the seller agreed to complete the custom programming required, provide the hardware required, install the hardware and software and train the restaurant employees to operate the system. The court implicitly found that all of these obligations were intimately connected and proceeded to recognize that the obligation to give or deliver an operational computer system was the fundamental obligation, and thus the entire contract was properly characterized as one of sale.

In this case, the various obligations noted in the Lease And Operating Agreement, including the Port Commission's obligation to provide Headwaters with exclusive use of part of the port area, Headwaters's obligation to build the barge loading facility, the Port Commission's obligation to provide a hard surface road, etc., were all intimately related. See Record Document 57, Ex. A-3, at ¶ 13 (emphasis added) ("Each condition, provision or obligation hereof is essential to this" Lease And Operating Agreement). The fundamental obligation was the obligation to ship fly ash, a generic obligation to do.

[26]This court has found that the Lease And Operating Agreement imposes an obligation upon Headwaters to build the barge loading facility specifically described in paragraph three and Exhibit A-2 of the agreement. If this obligation must be viewed in isolation and is properly defined as a construction contract, the court finds that this isolated contract would violate the Louisiana Public Bid Law and is thus null and void. See generally La. R.S. 38:2181, et. seq.; Record Document 71 at 4; Record Document 65 at 2-3.

The Port Commission has done an admirable job of noting the apparent application of the Louisiana Public Bid provisions to this situation. As defined by these statutes, the Port Commission qualifies as a public entity. See La. R.S. 38:2211(A)(11) (defining public entity); La. R.S. 34:3166 (creating the Red River Parish Port Commission). The agreement between Headwaters and the Port Commission establishing an obligation for Headwaters to build the barge loading facility qualifies as an agreement for a "public work" under the Public Bid Law. See La. R.S. 38:2211(A)(12) (public work means "erection, construction, alteration, improvement, or repair of any public facility or immovable property owned, used, or leased by a public entity."). A public work exceeding the sum of one hundred thousand dollars must be advertised and awarded by contract to the lowest responsible bidder. See La. R.S. 38:2212. The total remuneration the Port Commission must tender to Headwaters if the barge loading facility referenced in paragraph three of the Lease And Operating Agreement is built is $2,821,350.00.

fundamental. Headwaters implies that the fundamental obligation is the construction of a barge loading facility, and, accordingly, that the rules specific to construction contracts govern the present dispute. <u>See</u> Record Document 68 at 2. Even assuming <u>arguendo</u> that Headwaters is correct and that a portion of this contract could be considered a construction contract, the court strongly disagrees that this would be considered the primary obligation of the contract. The court finds that the fundamental obligation placed upon Headwaters was to ship fly ash rather than to build the barge loading facility. This is a generic obligation to do. Thus, the general rules applicable to obligations and contracts control rather than the specific rules designed for construction contracts.[27]   Accordingly, the arguments asserted by

---

There is no evidence that the special procedures outlined in the Louisiana Public Bid Law have been followed in this case. Any contract entered into for the construction of public works in violation of the Louisiana Public Bid Law is "null and void." La. R.S. 38:2220.

In its rebuttal to the Port Commission's Louisiana Public Bid Law argument, Headwaters has relied on one legal defense. Citing <u>JTS Realty Corp.</u>, 499 So. 2d 274, Headwaters asserts the Lease And Operating Agreement is an industrial inducement contract, and is therefore not subject to the public bid law. <u>See</u> Record Document 68 at 2. However, as the Port Commission notes, the scope of the inducement statute extends only to "the authority to sell, lease, or otherwise dispose of . . . all or part of an industrial plant site, building, port, harbor, or terminal facility, or other property owned by the political subdivision." La. R.S. 33:4717.2(A). The industrial inducement statute does not appear to extend to cover a contract between a public entity and a private entity obligating the private entity to construct a barge loading facility in return for several million dollars in reimbursement funds. Furthermore, as discussed in <u>JTS Realty Corp.</u>, in order to constitute a valid industrial inducement contract a contract must be published to the public for a certain period of time before an ordinance is adopted granting the contract. <u>See</u> <u>JTS Realty Corp.</u>, 499 So. 2d at 280. There is no evidence that the public notice procedure required for industrial inducement contracts was followed in this case. Accordingly, as explained in <u>JTS Realty Corp.</u>, if this is a industrial inducement contract then this procedural failure renders this contract null and void.

[27] The bulk of the Lease And Operating Agreement is designed specifically around the obligation to ship fly ash rather than the construction of the barge loading facility discussed

Headwaters which are based on the assumption that the rules concerning construction contracts govern in the instant case are not relevant to the present matter.

### iii. Headwaters's Third Defense.

In its third defense, Headwaters asserts that this alleged deviation from the design for the barge loading facility was an "obvious deficiency as to which the Port Commission is estopped from complaining after construction ceased." Record Documents 64 at 4 and 63 at 9-10. To the extent this is not a construction contract based argument, which as previously explained is irrelevant to this case, this is an

---

herein. A few examples of this focus are cited below.

The court notes that in paragraph one of the Lease And Operating Agreement, the Lessee is granting Lessor the exclusive use of an area of the Red River Parish Port "for the transport of fly ash. . . ." Record Document 57, Ex. A-3 at ¶1. Contemporaneously with the execution of the agreement, Headwaters had to tender an executed copy of the fly ash supply agreement between itself and its main Puerto Rican buyer. See id.

The paragraph introducing the obligation to build the barge loading facility begins with a sentence explaining that the Port Commission will reimburse Headwaters for costs incurred in constructing such a facility under certain circumstances "[a]s an incentive for Lessee to throughput waterborne tonnage through Lessor's facility." Id., Ex. A-3 at ¶ 3. The only such tonnage specifically detailed in the agreement is fly ash. See id. This same section makes it clear that the barge loading facility is considered an asset "specific to and only useable in [Headwaters's] operations." Id. It is clear the only useful purpose the barge loading facility has, under the terms of the agreement, is to facilitate the shipment of a certain amount of fly ash per year. If the facility is not used to process a certain average amount of fly ash per year for the first ten years, the Port Commission inserted a provision requiring additional payments from Headwaters as compensation for the placement of the otherwise useless barge loading facility on Red River Parish property. See id. The agreement surrounding the construction of the barge loading facility is clearly incidental to Headwaters's primary obligation to ship fly ash.

Paragraph nineteen states that "[i]t is understood that Lessee shall be engaged in the operation of the business of shipping fly ash." Id., Ex. A-3 at ¶ 19. Headwaters binds itself to ship all fly ash obtained from the Dolet Hills Power Plant which is to be shipped by water out of the Red River Parish Port. Id. The early termination provision, found in paragraph twenty, is based on a failure to ship a certain amount of cargo per year. See id., Ex.A-3 at ¶ 20. Again, the only cargo specifically discussed in the agreement is fly ash.

equitable estoppel argument.  See Record Documents 63 at 10 and 64 at 4[28].  The

elements of equitable estoppel and the rules governing this theory were described at

length in the section of this ruling addressing the Natchitoches Parish Port fly ash

shipments.  As the court found in that section, see page 16, the mere silence of the

Port Commission is not enough in this case to satisfy the requirements of equitable

estoppel because there is no evidence that there was any disparity between the parties

as to their knowledge of the relevant facts. Furthermore, Headwaters has failed to

produce evidence demonstrating that it relied on any particular communication from

the Port Commission or any of the Port Commission's alleged agents when it changed

the design of the barge loading facility and constructed a four station barge loading

facility instead of a six station barge loading facility.  Therefore, under either the

more lenient or more stringent versions of equitable estoppel outlined previously,

Headwaters has failed to establish that equitable estoppel applies in this case.

### iv. Headwaters's Fourth Defense.

For its fourth and final defense, Headwaters has asserted that it has not received

proper notice of this and other alleged breaches of the Lease And Operating

Agreement. This allegation was answered under the section of this ruling addressing

the Natchitoches Parish Port fly ash shipments, found on page 24.  Proper notice of

default was provided.  The state court petition asserted that Headwaters breached the

---

[28]Headwaters cites a case which clearly applies the theory of equitable estoppel in support
of this argument and a case applying a principle specific to construction contracts.

Lease And Operating Agreement when it "changed the design of the loading facility from 6 to 4 barges without the change being approved by the plaintiff . . . ." Record Document 1, State Court Petition at ¶ 8. No curative actions were commenced within thirty days of the notice as it concerns the breach regarding the barge loading facility. Thus, Headwaters's breach of the Lease And Operating Agreement related to the construction of a barge loading facility which does not comport with the requirements noted in paragraph three of the Lease And Operating Agreement is sufficient to support a finding of default.

### d. The Fourth Alleged Breach.

The Port Commission argues that Headwaters has breached portions of paragraph two of the Lease And Operating Agreement. This paragraph sets forth the rules governing the payment of rentals and other charges. In pertinent part, the paragraph states:

> This lease is made for and in consideration of the covenants herein contained and the obligation of Lessee to pay to Lessor a base rent. *The base rent* is composed of an amount of ($3,000.) per acre annually for the (1.7) acres of property designated as the Exclusive Use Area per Exhibit A and facility improvement rental *associated with the permanent improvements constructed for the Lessee's benefit* in the amount of ($55,000.) annually for the initial three (3) years of this Lease and for the years subsequent to the initial three (3) in the amount of ($100,000) annually for the permanent improvements. The base rent is subject to adjustments annually, to reflect the change in the consumer price index as established by the United States Government, Department of Labor. Annual *base rent shall be payable in advance on the anniversary date of facility completion* commencing on the transfer date

of the Bill of Sale between Lessor and Lessee. Base rent amounts will be invoiced thirty days prior to the due date with adjustments, subsequent Year 3, calculated on the prior annual consumer price index change. *In addition to base rent, Lessee shall pay wharfage* on all cargo *handled through the facility. Wharfage* will commence at $0.20 per ton of fly ash *handled at the port facility.* The minimum *wharfage* per year will be $10,000.00. If 50,000 tons have not been shipped *by the anniversary date for the preceding year*, Lessee will within thirty (30) days pay to Lessor the difference between the *wharfage* paid per ton and the minimum tons shipped. . . . All rentals due on the basis of tonnage shipped shall be due immediately upon completion of the movement of cargo *through the leased premises* . . . .

Record Document 57, Ex. A-3 at ¶ 2 (emphasis added). The paragraph describes two groups of payment obligations, a "base rent," and "wharfage on all cargo handled through the facility."

The Port Commission notes that

[I]t appears . . . the parties agree that Headwaters'[s] obligation, under the express terms of the Lease And Operating Agreement, to pay "base rent" was subject to the suspensive conditions of (1) first, the completion of the facility and (2) second and subsequently, the sale of the facility from Headwaters to the [Red River Parish Port Commission].

Record Document 61 at 15. The Port Commission further observes that the parties agree that since one or more of these suspensive conditions has not been met to date, Headwaters has no current obligation to pay base rent. See id.; see also Record Document 58 at 13.[29]

---

[29] The Port Commission asserts that both of the aforementioned conditions remain unfulfilled. It argues that the "facility" referenced in the pertinent portion of paragraph two of the Lease And Operating Agreement is the "facility" described in paragraph three and Exhibit A-2 of the Lease And Operating Agreement, i.e., a barge loading facility with six barge loading

Thus, the only issues related to rent payments or other charges presented to this court in the Port Commission's motion for partial summary judgment regard the language in paragraph two of the Lease And Operating Agreement which follows the phrase: "In addition to base rent, Lessee shall pay wharfage . . . ." Record Document 57, Ex. A-3 at ¶ 2. Hereinafter this section of paragraph two is referred to as the "wharfage provisions." The parties seem to generally agree that two groups of obligations are created by the wharfage provisions: a duty to pay wharfage at a certain rate per ton of cargo (this rate is set at $0.20 per ton for fly-ash), and a duty to pay annual minimum wharfage. See id.; Record Document 57 at 14; Record Document 58 at 13. The parties disagree as to whether the obligation to pay either form of wharfage has become effective, and, if so, whether any such obligations have been met.

The Port Commission asserts that, in contrast to the base rent provisions, there is no suspensive condition built into the Lease And Operating Agreement with

---

stations. The Port Commission asserts that the barge loading facility built by Headwaters, with only four barge loading stations, does not qualify as the aforementioned "facility." Therefore, the first condition for base rent, the completion of "the facility," is not satisfied.

Furthermore, since the facility built by Headwaters allegedly does not match the description in paragraph three of the Lease And Operating Agreement, the Port Commission claims it has no duty to purchase this facility from Headwaters and has refused to do so. Accordingly, the second condition which must be satisfied to initiate the duty to pay base rent, the sale of the facility from Headwaters to the Port Commission, has not been satisfied.

Headwaters asserts the first condition for base rent has been met as it has built the "facility" referenced in paragraph two of the Lease And Operating Agreement. However, Headwaters asserts the second condition for base rent has not been met since the Port Commission has refused to purchase the facility built by Headwaters. See Record Document 57 at 14.

respect to the wharfage provisions. Accordingly, it argues that Headwaters's duty to pay both types of wharfage was effective the moment the Lease And Operating Agreement was executed on August 13, 2003.

The Port Commission then cites evidence in the record to establish that Headwaters shipped fly ash through the Red River Parish Port in late 2003, May of 2006, and February of 2007. See Record Document 58 at 14. Headwaters paid wharfage for the 2003 shipment, but the Port Commission states that Headwaters did not submit wharfage payments in 2006 or 2007. See id. Furthermore, the Port Commission asserts that Headwaters did not pay the minimum wharfage due for any year until December 14, 2007, over twelve months after the Port Commission filed suit, when a lump sum payment was made sufficient to cover minimum wharfage for the years 2004-2007. See id. The Port Commission argues that these facts are sufficient to establish that Headwaters made untimely rental payments and therefore breached the Lease And Operating Agreement.

In response, Headwaters asserts that under the terms of the Lease And Operating Agreement, it does not owe rental or wharfage payments of any type until the barge loading "facility" referenced therein is constructed and operational and until the Port Commission purchases and accepts title to this facility. See Record Document 57 at 14. Headwaters asserts that it built the "facility" referenced in paragraph two of the Lease And Operating Agreement, but since the Port Commission has not purchased its facility, Headwaters's duty to pay wharfage has not

come into effect. In support of its proposed interpretation, Headwaters suggests that it would be unreasonable to interpret the wharfage provisions in a manner which require it to pay the Port Commission wharfage for use of a "facility" that the Port Commission does not own. See Record Document 57 at 15. Additionally, Headwaters asserts that it made the aforementioned 2003 wharfage payment by mistake, and it paid the Port Commission $76,566 for minimum wharfage and $5,100 per year for land rental for five years in December of 2007 even though it had no contractual obligation to do so. See id. Even if there was an obligation to pay wharfage during the time frame referenced by the Port Commission, Headwaters asserts that it was not provided proper invoices or notice of default. See id.

The court first finds that the obligation to pay minimum wharfage has not yet come into effect, and thus denies the Port Commission's motion for partial summary judgment in this regard. The wharfage provisions address the obligation to pay minimum wharfage as follows:

> The minimum wharfage per year will be $10,000.00. If 50,000 tons have not been shipped *by the anniversary date* for the preceding year, Lessee will within thirty (30) days pay to Lessor the difference between the wharfage paid per ton and the minimum tons shipped.

Record Document 57, Ex. A-3 at ¶ 2 (emphasis added). Each of these sentences plays an integral role in the establishment of the minimum wharfage requirement. This language sets the minimum requirement for cargo shipments out of the Red River Parish Port at 50,000 tons. The $10,000 is clearly the result of the application of the

53

previously established wharfage rate for fly ash, $0.20 per ton, to the 50,000 ton minimum cargo requirement.[30] The language also establishes the annual time frame within which Headwaters must meet this minimum cargo/wharfage requirement. It must ship 50,000 tons by the "anniversary date" for the preceding year, or pay the difference between the amount paid per ton up until that point and $10,000. See id. The obligation to pay minimum wharfage does not become due until the "anniversary date."

The phrase "anniversary date" was introduced in the section of paragraph two regarding the base rent. This relevant prior statement reads "[a]nnual base rent shall be payable in advance on the *anniversary date of facility completion* commencing on the transfer date of the Bill of Sale between Lessor and Lessee." Id. The term "facility," as used in this quoted phrase, is not explicitly defined. However, the Port Commission and Headwaters appear to agree that this use of the term "facility" refers to the barge loading structure referenced in paragraph three and Exhibit A-2 of the Lease And Operating Agreement. See Record Document 61 at 15; Record Document 57 at 14.[31] As was explained previously, this court finds that a "facility" matching the

---

[30] The court recognizes that the Lease And Operating Agreement states that if goods other than fly ash are shipped through the Red River Parish Port, the parties will set an appropriate wharfage rate for this new cargo. This new cargo and the accompanying fees would presumably count towards the minimum wharfage requirement. However, it is clear that, at present, the minimum wharfage requirement is designed to address fly ash shipments.

[31] As previously noted, Headwaters argues that the specifications noted in Exhibit A-2 and paragraph three of the Lease And Operating Agreement regarding a barge loading facility were later modified by the Port Commission's actions or agents. However, Headwaters expresses

specifications in paragraph three and Exhibit A-2 of the Lease And Operating Agreement has not been built. Without the construction of such a structure, there is no "facility completion,"and thus no "anniversary date of facility completion."

The court believes that any reasonable interpretation of paragraph two must infer that the two references to "anniversary date" are meant to refer to the same point in time. Thus, since the "anniversary date" in the base rent section of paragraph two has not yet come to pass, as explained above, the "anniversary date" in the wharfage provisions which triggers the minimum wharfage obligation has also not yet come to pass. Accordingly, the court does not find that Headwaters has tendered late wharfage payments because the obligation to pay minimum wharfage is not yet in effect. Thus, the Port Commission's motion for summary judgment is denied in this regard.

The remaining issue is whether Headwaters has an active obligation to pay wharfage at a certain rate per ton of cargo shipped through the Red River Parish Port, and, if such an obligation exists, whether Headwaters's actions have breached this obligation. Regarding wharfage rates per ton of cargo, the Lease And Operating Agreement states:

> In addition to base rent, Lessee shall pay *wharfage* on all cargo handled through *the facility*. *Wharfage* will commence at $0.20 per ton of fly ash handled at the port facility . . . . All rentals due on the basis of tonnage shipped shall be due immediately upon completion of the

---

obvious agreement that the term facility, as used in the above-quoted first "anniversary date" phrase in paragraph two of the Lease And Operating Agreement, is a reference to the barge loading structure discussed in paragraph three and exhibit A-2 of the agreement.

movement of cargo through the leased premises . . . .

Record Document 57, Ex. A-3 at ¶ 2 (emphasis added).

After considering the plain reading of this provision, and taking into account the parties' arguments on the matter, the court finds that the wharfage fee charged on a per ton basis is not yet due. This section of the Lease And Operating Agreement begins with the introductory phrase "Lessee shall pay *wharfage* on all cargo handled through *the facility*." Id. (emphasis added). The word "wharfage" refers to the charge imposed for the use of a wharf for handling freight or docking a ship. See Webster's Third New International Dictionary 2599 (2002); Random House Dictionary of the English Language 2163 (2d ed. 1987); La. Civ. Code art. 2047 (the common, prevailing use of the term must be considered when interpreting a contract). The term "wharf" refers to a structure which is built along the shore or projecting into a harbor, stream, etc., so that vessels may be moored alongside to load or unload cargo or to lie at rest. See id.

Thus, in keeping with the common definitions of "wharf" and "wharfage," the court has considered which "wharf" the various fees in the wharfage provisions are associated with. The introductory phrase to the wharfage provisions states that wharfage is due on all cargo handled through *the facility*. As noted above, the parties agree that the reference to "the facility" two sentences before the wharfage provision at issue is a reference to the barge loading facility discussed in paragraph three of the agreement. Thus, it seems only logical to conclude that the reference to "facility" in

the wharfage provisions is clearly also a reference to that same barge loading facility. Furthermore, the court notes that the barge loading facility described in paragraphs two and three of the Lease And Operating Agreement is the only wharf-like structure specifically described in the entirety of the agreement.

As the court finds herein that the facility described in paragraph three has not been built, the court must find that the obligation to pay wharfage per ton of cargo shipped through said facility has not yet come into effect, and thus Headwaters cannot be considered to have tendered said payments in an untimely fashion. Accordingly, the Port Commission's motion for partial summary judgment is denied on this point.

### e.  Summary Of The Ruling Regarding The Port Commission's Motion For Partial Summary Judgment.

In sum, the court finds that Headwaters has breached the Lease And Operating Agreement in a manner sufficient for a finding of default in two respects: by shipping fly ash out of the Natchitoches Parish Port during the term of the Lease And Operating Agreement, and by failing to build a barge loading facility in compliance with the requirements noted in paragraph three and Exhibit A-2 of the Lease And Operating Agreement.  Thus, the Port Commission's motion for partial summary judgment is **GRANTED** in these respects.   However, this court finds that Headwaters's duty to pay wharfage of any type has not come into effect under the plain terms of the Lease And Operating Agreement, and thus Headwaters cannot be considered to have tendered late wharfage payments.  Furthermore, Headwaters's

failure to ship 30,000 tons of fly ash over any two year period does not breach any obligation imposed by the Lease And Operating Agreement and thus cannot be grounds for a finding of default. Therefore, the Port Commission's motion for partial summary judgment is **DENIED** in these two respects.[32]

## 2. Headwaters's Motion For Summary Judgment.

Headwaters's motion for summary judgment is first and foremost a request for a judgment recognizing and enforcing Headwaters's alleged right to payment[33] from the Port Commission for the construction costs incurred while building a barge loading facility with four barge loading stations. Headwaters asserts that the Port Commission's failure to provide said reimbursement constitutes a breach of the Lease And Operating Agreement. Headwaters also asks this court to dismiss with prejudice all of the claims asserted by the Port Commission that Headwaters has breached the

---

[32] The court has answered the primary questions asserted in the motions for summary judgment filed by both parties without the necessity of considering the Port Commission's argument, asserted only in opposition to Headwaters's motion for summary judgment, that there are genuine issues of material fact as to the Port Commission's consent regarding the Lease And Operating Agreement. See Record Document 61 at 18-22.

[33] If Headwaters had built the barge loading facility described in paragraph three of the Lease And Operating Agreement, the Port Commission would have had an obligation to reimburse Headwaters up to $2,321,350 for monies spent on the construction of said barge loading facility, and Headwaters would have been entitled to recoup an additional $500,000 through reduced rental payments over ten years. See Record Document 57, Ex. A-3 at ¶ 3. Under the terms of the Lease And Operating Agreement, should the lease be terminated for any reason other than an uncured breach by Headwaters, the Port Commission has agreed to pay Headwaters the unamortized portion of the $500,000 which Headwaters has not yet recouped. See id. Headwaters claims the agreement has been breached by the Port Commission due to the Port Commission's failure to purchase and take title to the barge loading facility built by Headwaters and that Headwaters is therefore due $2,821,350 ($500,000 + $2,321,350).

Lease And Operating Agreement. As noted above, Headwaters has not expressed any objections to the material facts, but has instead submitted several legal arguments in an attempt to justify the facts and apparent deviations from the plain text of the Lease And Operating Agreement noted by the Port Commission.

These issues have been fully addressed in this ruling. Based on the reasoning set forth in this ruling, the court finds that Headwaters is not entitled to payment under the terms of paragraph three of the Lease And Operating Agreement because it did not construct a barge loading facility which comported with the requirements explained therein, namely constructing a barge loading facility with six barge loading stations. Accordingly, the Port Commission did not breach the Lease And Operating Agreement by failing to reimburse Headwaters for the costs incurred during the construction of a four station barge loading facility. Furthermore, the court finds that two of the four alleged breaches asserted by the Port Commission are in fact violations of the Lease And Operating Agreement sufficient to place Headwaters in default. Accordingly, Headwaters's motion for summary judgment is **DENIED.**

## III. CONCLUSION

Based on the foregoing analysis;

**IT IS ORDERED** that the Port Commission's motion for partial summary judgment (Record Document 58) is **GRANTED** in respect to its claims of breach regarding the Natchitoches Parish Port fly ash shipments and the construction of the barge loading facility referenced in paragraph three of the Lease And Operating

Agreement.  The Port Commission's motion is **DENIED** in respect to the claims of breach based on wharfage payments and the failure to ship 30,000 tons of fly ash over any two year period.

 **IT IS FURTHER ORDERED** that Headwaters's motion for summary judgment (Record Document 57) is **DENIED**.

 **THUS DONE AND SIGNED** at Shreveport, Louisiana, this 19th day of March, 2010.



JUDGE TOM STAGG